The TIMKEN COMPANY,
Plaintiff–Appellant,

v.

The UNITED STATES, Koyo Seiko Co.,
Ltd., Koyo Corporation of U.S.A., Inc.,
NSK, Ltd. and NSK Corporation, Defen-
dants–Appellees.

Nos. 93–1312, 93–1455.

United States Court of Appeals,
Federal Circuit.

Sept. 27, 1994.

Terence P. Stewart, Stewart & Stewart, Washington, DC, argued, for plaintiff-appellant. With him on the brief were Eugene L. Stewart, James R. Cannon, Jr., John M. Breen and Vincent J. Branson.

Velta A. Melnbrencis, Asst. Director, Commercial Litigation Branch, Dept. of Justice, Washington, DC, argued, for defendant-appellee. With her on the brief were Frank W. Hunger, Asst. Atty. Gen. and David M. Cohen, Director. Also on the brief were Stephen J. Powell, Chief Counsel, Berniece A. Browne, Sr. Counsel, and Joan L. MacKenzie, Attorney–Advisor, Office of the Chief Counsel for Import Admin., U.S. Dept. of Commerce, of counsel.

James A. Geraghty, Donohue & Donohue, of New York City, argued, for defendants-appellees, NSK, Ltd. and NSK Corp., Joseph F. Donohue, Jr., and Kathleen C. Inguaggiato, of Donohue & Donohue were on the brief for defendants-appellees.

Peter O. Suchman, Susan P. Strommer, Robert Torresen, Jr., and Robert A. Calaff, Powell, Goldstein, Frazer & Murphy, Washington, DC, were on the brief, for defendants-appellees, Koyo Seiko Co., Ltd. and KOYO Corp. of U.S.A., Inc.

Before ARCHER, Chief Judge *,
FRIEDMAN, Senior Circuit Judge, and
RADER, Circuit Judge.

RADER, Circuit Judge.

The United States Court of International Trade affirmed the International Trade Administration's (ITA) imposition of dumping duties on tapered roller bearings four inches or less in diameter (TRBs) imported by NSK, Limited (NSK) from April 1, 1974 through July 31, 1980, and by Koyo Seiko Company, Limited (Koyo Seiko) from April 1, 1974 through March 31, 1979 (1974–80 entries, collectively). *Koyo Seiko Co. v. United States,* 819 F.Supp. 1093 (Ct.Int'l Trade 1993) (affirming ITA's ultimate calculations of duties and dismissing all appeals related to the 1974–80 entries), *aff'd in part, rev'd in part, and remanded,* 20 F.3d 1160, —— Fed.Cir. (T) —— (Fed.Cir.1994). The trial court also affirmed ITA's imposition of duties on TRBs imported by NSK and Koyo Seiko from August 1, 1986 through July 31, 1987 (1986–87 entries). *Timken Co. v. United States,* 809 F.Supp. 121 (Ct.Int'l Trade 1992). In both cases, the Court of International Trade upheld ITA's denial of interest payments under 19 U.S.C. § 1677g(a) (1988) on underpayments of antidumping duties. For the 1974–80 entries, the trial court also upheld ITA's decision to exclude United States subsidiary profits from calculation of exporter's sales price (ESP) under 19 U.S.C. § 1677a(e)(1) (1988). Because ITA correctly applied sections 1677g and 1677a(e)(1), this court affirms.

## BACKGROUND

On October 31, 1973, the Timken Company (Timken) petitioned the Department of Treasury to impose antidumping duties on TRBs manufactured in Japan. *Tapered Roller Bearings From Japan; Antidumping Proceeding Notice,* 38 Fed.Reg. 33,408 (Dep't Treas.1973). Under the Antidumping Act of 1921, 19 U.S.C. §§ 160–173 (1970) (repealed 1980) (the 1921 Act), then in effect, Treasury initiated an investigation and found that TRBs were being, or were likely to be, sold at less than fair value. *Tapered Roller Bearings From Japan; Antidumping Determination of Sales at Less Than Fair Value,* 39 Fed.Reg. 32,337 (Dep't Treas.1974). On January 29, 1975, the International Trade Commission (ITC) published its determination that the domestic industry was likely to be injured by sales of TRBs imported from Japan. *Tapered Roller Bearings and Certain Components Thereof From Japan; Determi-*

---

* Judge Archer assumed the position of Chief Judge on March 18, 1994.

nation of Likelihood of Injury, 40 Fed.Reg. 4,366 (Int'l Trade Comm'n 1975). Treasury then issued its dumping finding on August 18, 1976. *Tapered Roller Bearings and Certain Components From Japan,* 41 Fed.Reg. 34,974 (Dep't Treas.1976). Treasury issued master lists which set bonding rates for NSK and Koyo Seiko. The bonding rates varied from 0% to 12%. Treasury did not calculate an estimated dumping margin. NSK and Koyo Seiko were consequently not required to make cash deposits of estimated dumping duties. Instead, NSK and Koyo Seiko TRBs were entered under bond. The bonds guaranteed payment of the margins to be set by a final determination. These entries were never liquidated.

In 1980, the Department of Commerce replaced the Department of Treasury as the administering authority of the antidumping law. Exec. Order No. 12,188, 3 C.F.R. 131, 133 (1981), *reprinted in* 19 U.S.C. § 2171 note (1988). Also, the Trade Agreements Act of 1979, Pub.L. No. 96–39, 93 Stat. 144 (1979) (codified as amended in scattered sections of 19 U.S.C.) (1979 Act), repealed the 1921 Act and established new administrative procedures for administration of antidumping law. The 1979 Act subjected Treasury dumping findings made under the 1921 Act to annual administrative review by the ITA, an agency within Commerce. The 1979 Act, sec. 101, § 751(a), 93 Stat. 175 (1979) (current version at 19 U.S.C. § 1675(a) (1988)). Under this statutory mandate, ITA undertook review of the 1976 dumping finding. *Administrative Review of Antidumping Determinations,* 45 Fed.Reg. 20,511 (Dep't Comm.1980). Annual administrative reviews proceeded until a 1984 amendment to 19 U.S.C. § 1675(a) made administrative review available only upon request. Trade and Tariff Act of 1984, Pub.L. 98–573, § 611(a)(2)(A), 98 Stat. 2948, 3031 (amending 19 U.S.C. § 1675(a)(1) (1982)). Timken requested such reviews for the entries at issue in this appeal.

## I. The 1974–80 entries

After a lengthy administrative process, ITA published its final determinations covering the 1974–80 entries on June 1, 1990. *Tapered Roller Bearings Four Inches or Less in Outside Diameter From Japan; Final Results of Antidumping Duty Administrative Review,* 55 Fed.Reg. 22,369 (Dep't Comm.1990) (Final Results for 1974–80 Entries). ITA set the dumping margins at 4.99% to 23.43% for NSK, and 18.81% to 35.89% for Koyo Seiko. *Id.* at 22,382. ITA required no interest payments under 19 U.S.C. § 1677g(a) (1988) on unpaid duties owed by NSK and Koyo Seiko. Final Results for 1974–80 Entries, 55 Fed.Reg. at 22,370. Section 1677g(a) demands interest on "overpayments and underpayments of amounts deposited on merchandise entered." ITA determined that "amounts deposited" in section 1677g(a) refers only to cash deposits of estimated antidumping duties, and not to securities such as posted bonds. Final Results for 1974–80 Entries, 55 Fed.Reg. at 22,370.

ITA also declined to deduct the profits earned by the importers' United States subsidiaries from ESP under 19 U.S.C. § 1677a(e)(1) (1988). Final Results for 1974–80 Entries, 55 Fed.Reg. at 22,371. ITA refused to extend section 1677a(e)(1), which provides for reductions to ESP for "commissions for selling in the United States the particular merchandise under consideration," to encompass such profits. Final Results for 1974–80 Entries, 55 Fed.Reg. at 22,370. In addition, ITA remarked that "a deduction from United States price for profit without a corresponding adjustment to foreign market value would lead to unfair comparisons of prices." *Id.*

Timken appealed various aspects of ITA's Final Results for the 1974–80 Entries twice to the Court of International Trade. In its first appeal, Timken challenged ITA's decision not to impose interest under section 1677g(a) for duties owed on the 1974–80 entries. *Timken Co. v. United States,* 777 F.Supp. 20 (Ct.Int'l Trade 1991) (*Timken I*). The Court of International Trade upheld the agency's interpretation of "amounts deposited" in section 1677g(a). *Id.* at 27. In support of this decision, the court noted that "the provision requiring cash deposits of estimated duties [19 U.S.C. § 1673e(a)(3) (1988)] and the interest provision [section 1677g(a)] were intended to operate simultaneously."

*Id.* at 26. Noting the deference afforded ITA's interpretation of the antidumping statute, the court affirmed ITA's determination that section 1677g(a) applies only to cash deposits of estimated duties. *Id.* at 27. The court also declined to impose interest under 19 U.S.C. § 580 (1988) or in equity. *Id.*

In the second appeal to the Court of International Trade, Timken challenged, *inter alia,* ITA's refusal to deduct the profits of the Japanese exporters' domestic subsidiaries from ESP calculations. *Timken Co. v. United States,* 795 F.Supp. 438, 440 (Ct.Int'l Trade 1992) (*Timken II* ). Relying on previous Court of International Trade decisions rejecting Timken's interpretation of the term "commissions" in section 1677a(e)(1) as including profits, the court agreed with ITA's interpretation. *Id.* at 445. The court affirmed ITA's determinations, remanding for recalculation of the dumping margins for other reasons. *Id.* at 448–49. The Court of International Trade affirmed the remand results on March 4, 1993 and dismissed the appeals relating to the 1974–80 entries. *Koyo Seiko Co.,* 819 F.Supp. at 1096. Timken appealed to this court.

## II. The 1986–87 entries

In 1990, ITA published the final results for the 1986–87 entries. *Tapered Roller Bearings Four Inches or Less in Outside Diameter and Certain Components Thereof From Japan; Final Results of Antidumping Duty Admin. Review,* 55 Fed.Reg. 38,720 (1990) (Final Results for 1986–87 Entries). ITA set dumping margins at 52.17% for Koyo Seiko and 35.00% for NSK. *Id.* at 38,729. ITA again exempted the importers from interest payments under section 1677g(a). *Id.* at 38,-726–27.

On November 25, 1992, the Court of International Trade affirmed ITA's interpretation of section 1677g(a) for the 1986–87 entries. *Timken Co. v. United States,* 809 F.Supp. 121, 122–23 (Ct.Int'l Trade 1992) (*Timken III* ). The trial court relied in part on its earlier disposition of this issue in *Timken I* to reject Timken's interpretation of section 1677g(a) as requiring interest on duties owed by NSK and Koyo Seiko. *Timken III,* 809 F.Supp. at 122. The court also rejected

Timken's attempt to distinguish *Timken I* on the ground that the entries covered in *Timken I* almost all occurred before the enactment of section 1677g(a). The 1986–87 entries, by contrast, occurred when the 1979 Act was in full effect. The trial court, however, noted that the statute unambiguously requires interest "only on deposits and not on bonds." *Timken III,* 809 F.Supp. at 122. The court remanded only for correction of computer programming errors unrelated to this appeal. The Court of International Trade affirmed the remand results on June 8, 1993. *NSK, Ltd. v. United States,* Nos. 90–10–00543, –00546, –00548, 1993 WL 208797, 1993 Ct.Int'l Trade, LEXIS 98 (June 8, 1993). In a separate appeal, Timken appealed this decision to this court. By order dated August 23, 1994, this court consolidated both appeals.

## ANALYSIS

Under 19 U.S.C. § 1516a(b)(1)(B) (1988), the Court of International Trade reviews dumping determinations for substantial evidence in factual findings and correctness in legal conclusions. This court applies anew the statute's express judicial review standard when reviewing the trial court's decision. *Koyo Seiko Co. v. United States,* 20 F.3d 1160, 1164, —— Fed.Cir. (T) ——, —— (Fed. Cir.1994) (citing *PPG Indus., Inc. v. United States,* 978 F.2d 1232, 1236, —— Fed.Cir. (T) ——, —— (Fed.Cir.1992)).

## I.

Under the 1921 Act, Treasury did not impose interest on underpayments of estimated duties. The 1979 Act gave Commerce authority for the first time to assess interest. The 1979 Act, sec. 101, § 778(a), 93 Stat. at 188 (current version at 19 U.S.C. § 1677g(a)).

Section 1677g(a) provides:

Interest shall be payable on overpayments and underpayments of *amounts deposited* on merchandise entered, or withdrawn from warehouse, for consumption on and after—

(1) the date of publication of a countervailing or antidumping duty order under this subtitle or section 1303 of this title, or

(2) the date of a finding under the Antidumping Act, 1921.

19 U.S.C. § 1677g(a) (emphasis added). Thus, section 1677g(a) requires payment of interest on the difference between deposited amounts of estimated duties and final assessed duties. This court reviews *de novo* the trial court's determination that "amounts deposited" refers only to cash deposits, not to bond amounts.

■ In interpreting section 1677g(a), this court first consults the language of the statute itself. *See Chaparral Steel Co. v. United States*, 901 F.2d 1097, 1100–01, 8 Fed.Cir. (T) 101, 105 (Fed.Cir.1990). If the statute is clear on its face, then this court's review ends. *Id.* at 1101. If the statute is not clear on its face, then this court reviews ITA's interpretation to determine whether it is reasonable in light of the language, policies, and enactment history of the statute. *Id.* (citing *Corning Glass Works v. United States Int'l Trade Comm'n*, 799 F.2d 1559, 1565, 230 USPQ 822, 826 (Fed.Cir.1986)). This court accords ITA considerable deference in its interpretations of these statutory provisions. *Daewoo Elecs. Co. v. International Union of Elec., Elec., Technical Salaried & Machine Workers*, 6 F.3d 1511, 1516, —— Fed.Cir. (T) ——, —— (Fed.Cir.1993), *cert. denied* —— U.S. ——, 114 S.Ct. 2672, 129 L.Ed.2d 808 (1994).

The language of section 1677g(a) imposes interest only on "amounts deposited." Section 1677g(a) in isolation does not specify the meaning of "amounts deposited." In the context of the rest of the statutory scheme set forth in the 1979 Act, however, the meaning of this language becomes apparent.

Title 19, Chapter 4, Subtitle IV, Part II of the United States Code—"Imposition of Antidumping Duties"—as a general rule links

the word "deposit" to "cash." For instance, sections 1673b(d)(2) and 1673c(c)(1)(B) use the term "deposit" in conjunction with "cash." 19 U.S.C. §§ 1673b(d)(2), 1673d(c)(1)(B) (1988). *See also* 19 U.S.C. §§ 1673c(f)(2)(A)(iii), 1673c(h)(3)(B), 1673d(c)(2)(B), 1673d(c)(3)(B), 1673d(c)(4)(A) (1988). The Act clearly distinguishes cash deposits from bonds or other securities. *See, e.g.,* § 1673b(d)(2) ("cash deposit, bond or other security"); § 1673d(c)(1)(B) ("posting of a cash deposit, bond, or other security"); § 1673d(c)(3)(B) ("release any bond or other security, and refund any cash deposit required"). This association shows that the 1979 Act generally uses the term "deposit" to denote cash payments.

More important, the 1979 Act limits, with some exception, the use of bonds to the pre-duty order, investigative phase of antidumping proceedings. Section 1673e(a) provides that ITA, upon notification of an affirmative ITC injury determination, shall publish an antidumping duty order which

> requires the *deposit of estimated antidumping duties* pending liquidation of entries of merchandise at the same time as estimated normal customs duties on that merchandise are deposited.

19 U.S.C. § 1673e(a)(3) (1988) (emphasis added).[1] *See also* 19 U.S.C. § 1673g(a) (1988) (requiring persons by whom or for whose account the merchandise was imported to "deposit[ ] ... an estimated antidumping duty in an amount determined by the administering authority"). The estimated antidumping duty deposits, required upon publication of an antidumping duty order under section 1673e, differ from the cash deposits, bonds or other security required during the

---

[1] Title 19 also distinguishes cash deposits from bonds in the context of estimated customs duties. Section 1505 governs payment of estimated customs duties:

> (a) Deposit of estimated duties
> Unless merchandise is entered ... under bond, the importer of record shall deposit ... the amount of duties estimated by such customs officer to be payable thereon.
> (b) Collection or refund
> The appropriate customs officer shall collect any increased or additional duties due or re-

fund any excess of duties deposited as determined on a liquidation or reliquidation.

19 U.S.C. § 1505(a), (b) (1988). Note also that 19 U.S.C. §§ 197, 198 (1988) provide that customs duties must be paid in either cash or cash equivalents such as certified checks, coin certificates, or Treasury notes. Thus, estimated customs duty deposits are cash deposits. This provision supports the notion that section 1673e(a)(3) estimated antidumping duty deposits, required at the same time as estimated customs duty deposits, are also cash deposits.

investigative phase under sections 1673b(d)(2) and 1673d(c)(1)(B).

Section 1673e(c) further distinguishes estimated duty deposits—cash deposits—from bonds by allowing posting of the latter in lieu of the former under certain conditions. 19 U.S.C. § 1673e(c) (1988). Section 1673e(c)(1) states:

> The administering authority may permit, for not more than 90 days after the date of publication of an [antidumping duty] order ..., the posting of a bond or other security *in lieu of* the deposit of estimated antidumping duties required under [section 1673e(a)(3) ]....

19 U.S.C. § 1673e(c)(1) (emphasis added). Section 1673e(c)(1) gives ITA discretion to permit either posting of a bond, or a cash deposit, for ninety days. It requires cash deposits only after ninety days.

The enactment history of the 1979 Act further supports the distinction between cash and bonds. In explaining the bill, a House of Representatives committee reported:

> The second major change is the requirement that merchandise subject to an antidumping order may be entered only upon the deposit of estimated antidumping duties. Under present practice such merchandise may enter under bond. The Committee feels strongly that this practice does not sufficiently deter dumping.... The Committee believes that the requirement of *cash deposits* will ensure that complete information will be submitted to the Authority in a timely manner.

H.R.Rep. No. 317, 96th Cong., 1st Sess. 69 (1979) (emphasis added). The House Committee on Ways and Means also noted:

> The Committee recognizes the effect that the requirement of a cash deposit of estimated duties may have on importers, particularly small businesses, and does not wish to unduly burden those importers who have, in fact, taken steps to eliminate dumping.
>
> [The] bill provides a limited *exception to the requirement of a deposit of estimated duties* for importers.... Thus, for a three month period following the issuance of an antidumping order, the Authority may continue to permit entry of merchandise subject to the order under *bond*....

*Id.* at 69–70 (emphasis added). These passages underscore the 1979 Act's different treatment of cash deposits and bond amounts. Thus, the 1979 Act draws a clear distinction between a "deposit" in cash and a "bond or other security" with respect to estimated antidumping duties.

Section 1673f addresses overpayments and underpayments of estimated antidumping duties. Section 1673f(a) states:

> If the amount of a *cash deposit collected as security for an estimated antidumping duty* under section 1673b(d)(2) ... is different from the amount of the antidumping duty determined under an antidumping duty order ... then the difference ... shall be—
>
> (1) disregarded, to the extent the cash deposit collected is lower than the duty under the order, or
>
> (2) refunded, to the extent the cash deposit is higher than the duty under the order.

19 U.S.C. § 1673f(a) (1988) (emphasis added). This provision refers to cash deposits posted pursuant to section 1673b(d)(2) during the pre-antidumping order, investigative phase. Section 1673f(a) does not provide for any interest payments.

Section 1673f(b), however, refers to the "amount of estimated antidumping duty deposited under section 1673e(a)(3)"—estimated duties required by the antidumping duty order. Section 1673f(b) provides:

> If the amount of an estimated antidumping duty deposited under section [1673e(a) ] ... is different from the amount of the antidumping duty determined under an antidumping duty order.... then the difference ... shall be—
>
> (1) collected, to the extent that the deposit under section 1673e(a)(3) ... is lower than the duty determined under the order, or
>
> (2) refunded, to the extent that the deposit under section 1673e(a)(3) ... is higher than the duty determined under the order,

*together with interest as provided by section 1677g of this title.*

19 U.S.C. § 1673f(b) (1988) (emphasis added).

Title 19 contains similar provisions pertaining to countervailing duties. Section 1671b(d)(2) requires ITA to "order the posting of a cash deposit, bond, or other security" upon an affirmative preliminary determination that a subsidy is being provided with respect to the merchandise under investigation. 19 U.S.C. § 1671b(d)(2) (1988). Section 1671e(a) provides for publication of a countervailing duty order which "requires the deposit of estimated countervailing duties ... at the same time as estimated normal customs duties on that merchandise are deposited." 19 U.S.C. § 1671e(a)(4) (1988). Title 19 again differentiates between security deposits, as required by section 1671b(d)(2), and deposits of estimated duties, required by section 1671e(a), in section 1671f. Section 1671f(a) provides:

> If the amount of a cash deposit, or the amount of any bond or other security, required as security for an estimated countervailing duty under section 1671b(d)(2) ... is different from the amount of the countervailing duty determined under a countervailing duty order issued under section 1671e ... then the difference ... shall be—
>
> (1) disregarded, to the extent that the cash deposit, bond, or other security is lower than the duty under the order, or
>
> (2) refunded or released, to the extent that the cash deposit, bond, or other security is higher than the duty under the order.

19 U.S.C. § 1671f(a) (1988). For security posted under section 1671b(d)(2), section 1677g—the interest provision—does not apply. Section 1671f(b) applies to estimated countervailing duties:

> If the amount of an estimated countervailing duty deposited under section 1671e(a)(3) ... is different from the amount of the countervailing duty determined under a countervailing duty order ... then the difference ... shall be—

> (1) collected, to the extent that the deposit ... is lower than the duty determined under the order, or
>
> (2) refunded, to the extent that the deposit ... is higher than the duty determined under the order,
>
> *together with interest as provided by section 1677g of this title.*

19 U.S.C. § 1671f(b) (1988) (emphasis added).

The "amounts deposited" term of section 1677g(a) thus refers to a deposit of estimated duties. Section 1673e(c) clearly separates bonds or other securities from "deposit[s] of estimated antidumping duties." Accordingly, "amounts deposited" in section 1677g(a) refers solely to cash deposits of estimated duties provided under sections 1671e(a)(4) and 1673e(a)(3). Section 1677g(a)'s "amounts deposited" language does not encompass bonds. ITA and the trial court interpreted the above statutory scheme correctly by restricting the term "amounts deposited" in section 1677g(a) to cash deposits. *See* 19 C.F.R. §§ 353.24, 355.24 (1994) (requiring interest on the difference between cash deposits of estimated duties and assessed duties).

█ Contrary to Timken's assertion, recent amendments to section 1677g(a) did not alter the limitation of "amounts deposited" to cash payments. The Trade and Tariff Act of 1984, Pub.L. No. 98–573, sec. 621, § 778, 98 Stat. 3039 (1984) (1984 Act), merely changed the moment from which interest accrues. Instead of imposing interest from the date of an affirmative final determination under the 1979 Act, the 1984 Act amended section 1677g(a) to count interest from the date of either publication of a duty order under the 1979 Act or a dumping finding under the 1921 Act. This amendment, while altering the date from which interest would accrue, did not abolish the requirement of depositing estimated duties before exporters would be liable for interest under section 1677g(a).

The Tax Reform Act of 1986, Pub.L. No. 99–514, sec. 1886, § 708, 100 Stat. 2922, 2923 (1986), specified that merchandise not liquidated by November 4, 1984, was subject to interest payments under section 1677g(a). Again, this enactment did not disturb the

scope of the phrase "amounts deposited." In order to be liable for or entitled to interest under section 1677g(a), exporters must have made cash deposits of estimated duties. In the instant case, neither Treasury nor Commerce required Koyo Seiko or NSK to make cash payments of estimated antidumping duties. Instead these importers posted bonds. The 1979 Act associates bonds with "security." Thus, the Act intended bonds to serve as a means of securing payment, not a method of payment. Therefore, when Treasury and ITA did not require cash deposits of estimated duties over the period of sixteen years, they relieved Koyo Seiko and NSK of the duty to make interest payments. Without an obligation to pay estimated duties, section 1677g(a) cannot apply.

This court's recent decision in *Daewoo* does not compel a different result. In *Daewoo*, this court upheld ITA's decision to treat bonds and cash deposits similarly in the context of the cap on duties in 19 U.S.C. § 1673f(a). *Daewoo*, 6 F.3d at 1523. First, this court reached its result in *Daewoo* by sustaining ITA's regulation interpreting section 1673, 6 F.3d at 1521, a method of reasoning which also supports ITA's regulations, 19 C.F.R. §§ 353.24, 355.24, limiting section 1677g(a) solely to cash in this case.

More important, however, section 1673f(a) is very different from section 1673f(b), which expressly provides for interest under section 1677g(a). Section 1673f(a) places a cap on assessed duty rates when an importer subject to an affirmative preliminary determination makes a "cash deposit." 19 U.S.C. § 1673f(a). ITA's regulation permits both cash and bonds to institute a cap under section 1673f(a). 19 C.F.R. § 353.23 (1994). Under section 1673b(d)(2), both cash deposits and bonds are security for future duty assessments. Because both forms of security perform the same function under section 1673b(d)(2), ITA properly treats them similarly, as this court affirmed in *Daewoo*.

Furthermore, ITA's interpretation of section 1673f(a) is consistent with the corresponding countervailing duty provision, section 1671f(a). Section 1671f(a) provides a cap for countervailing duties equal to the "amount of a cash deposit, or the amount of

any bond or other security, required as security for an estimated countervailing duty under section 1671b(d)(2)." 19 U.S.C. § 1671f(a). By equating this language with section 1673f(a)'s "cash deposit collected as security," ITA interpreted the antidumping duty law consistently with the countervailing duty law. *See American Alloys, Inc. v. United States*, 30 F.3d 1469, 1473–1474 (Fed. Cir.1994) (noting that the 1974 amendments to the Trade Reform Act of 1973 sought to harmonize antidumping and countervailing duty laws). In both the antidumping and countervailing duty contexts, the statute acts to limit liability to the amount of cash, bond, or other security posted under section 1671b(d)(2) or section 1673b(d)(2).

Sections 1671f(b) and 1673f(b), however, provide for interest on over- and underpayments of estimated duties imposed by sections 1671e(a)(3) and 1673e(a)(3). Under section 1673e(a)(3), a cash deposit acts as a method of payment of preliminary duties. A bond, permitted only under the circumstances described in section 1673e(c), acts as security for undetermined future payments. In the context of the language of section 1677g(a), this distinction further supports ITA's different treatment of cash and bonds.

In sum, the requirement to make cash deposits of estimated duties, under the duty order, triggers the interest provision. Without the duty order, the importer has no obligation to make a cash deposit and consequently no obligation to pay interest. The Court of International Trade did not err in upholding ITA's determination that NSK and Koyo Seiko are not liable for interest under section 1677g(a).

■ Finally, this court declines to impose interest in equity. This court will not act in a manner contrary to a statutory provision dealing with the precise issue. *See Zenith Elecs. Corp. v. United States*, 988 F.2d 1573, 1582 (Fed.Cir.1993).

## II.

■ Title 19 provides for calculation of the ESP in section 1677a (1988). Section 1677a(c) defines ESP:

For purposes of this section, the term "exporter's sales price" means the price at which merchandise is sold or agreed to be sold in the United States, before or after the time of importation, by or for the account of the exporter, as adjusted under subsections (d) and (e) of this section.

Section 1677a(e) sets forth adjustments to the ESP. Section 1677a(e)(1) addresses the deduction for commissions earned in the sale of imported goods:

For purposes of this section, the exporter's sales price shall also be adjusted by being reduced by the amount, if any, of—

(1) *commissions* for selling in the United States the particular merchandise under consideration....

19 U.S.C. § 1677a(e)(1) (1988) (emphasis added).

The 1979 Act does not expressly define the term "commissions." Again this court begins with the statutory language. *See Chaparral Steel,* 901 F.2d at 1100–01. The usual and customary meaning of the word "commissions" does not include profits. For instance, Random House defines "commission" as "a sum or percentage allowed to agents, sales representatives, etc., for their services." Random House Unabridged Dictionary 412 (2nd ed. 1993). Thus, the meaning of the language itself forecloses a deduction for profits.

The enactment history supports the meaning of the statutory language. In a report on the antidumping bill, the Senate Committee on Finance stated that "the definition of 'exporter's sales price' requires the deduction ... of any amount included in such price attributable to (1) any costs, charges, United States import duties, and expenses ... [and] (2) any *commissions* for selling the particular merchandise in the United States." S.Rep. No. 16, 67th Cong., 1st Sess. 12 (1921) (emphasis added). This explanation of ESP does not refer to profits or contravene the conventional meaning of "commissions." In sum, the record shows no error in the trial court's reading of section 1677a(e)(1).

## CONCLUSION

The Court of International Trade correctly interpreted 19 U.S.C. §§ 1677g, 1677a(e)(1) (1988). Thus, this court affirms the Court of International Trade's decisions upholding ITA's remand results for the 1974–80 entries in *Koyo Seiko Co. v. United States,* 819 F.Supp. 1093 (Ct.Int'l Trade 1993), *aff'd in part, rev'd in part, and remanded,* 20 F.3d 1160, —— Fed.Cir. (T) —— (Fed.Cir.1994), and for the 1986–87 entries in *NSK,* Nos. 90–10–00543, –00546, –00548.

## COSTS

Each party shall bear its own costs.

*AFFIRMED.*

ARCHER, Chief Judge *, concurring.

I concur in the judgment of the majority. To the extent this opinion holds, on both issues, that the International Trade Administration's interpretation of the relevant statute is a reasonable one, I join the opinion.

* Judge Archer assumed the position of Chief Judge on March 18, 1994.